Marquetta Ann **JACKSON**, Administratrix of the Estate of Jerry Ray Jackson, Deceased, Plaintiff-Appellant,

v.

**SHELL OIL COMPANY**, Defendant-Appellee.

James Norman **WILMOTH**, Plaintiff-Appellant,

v.

**SHELL OIL COMPANY**, Defendant-Appellee.

Nos. 18254, 18255.

United States Court of Appeals
Sixth Circuit.

Oct. 4, 1968.

Eulyse M. Smith, Memphis, Tenn., for appellants; Beverly Ray Owens, George E. Whitworth, Memphis, Tenn., on brief.

Thomas R. Prewitt, Memphis, Tenn., for appellee.

Before EDWARDS, PECK and COMBS, Circuit Judges.

EDWARDS, Circuit Judge.

Plaintiffs appeal from an adverse jury verdict after trial before the United

States District Court for the Western District of Tennessee. Plaintiffs are the personal representatives and survivors of two of the four persons who were killed in a strange and tragic accident on December 4, 1965, on the outskirts of Memphis, Tennessee. The accident occurred at 12:55 a. m. on Interstate Highway 240, which bounds the perimeter of Memphis. The accident was triggered by drifting ground fog. On the same night between 10:15 p. m. and midnight there were 35 accidents on the same stretch of highway and within ten minutes after this accident there were six more.

Plaintiffs' decedents were two of four people seated in the rear seat of a passenger automobile. All four were killed instantly when defendant Shell Oil's truck carrying 9,000 gallons of gasoline ran into their car from the rear. Plaintiff's brief describes the essential facts of the accident thus:

"The highway was covered with fog and smog in the vicinity of the accident, and the automobile in which decedents were passengers came to a stop in the fog when its driver could no longer see ahead, and was almost instantly struck from the rear by defendant's Tractor Trailer Unit, traveling between 40 and 50 miles per hour in the same east bound lane."

The undisputed facts show that plaintiffs' car had just passed the Shell Oil truck and returned to the same lane in which it was traveling when the fog was encountered. They also show the opposing reactions of the two fog-blinded drivers. The driver of the passenger automobile stopped in the center lane of the interstate highway while the oil truck driver started to slow down by "feathering" his truck's air brakes.

It should be noted also that the undisputed testimony of plaintiffs' driver and defendant's driver set the Shell Oil truck speed just before it encountered the fog at approximately 45 miles per hour, and that the legal speed limit at that point was 65 miles per hour.

The main thrust of plaintiffs' allegation of negligence, however, is that the fog was there to be seen, that defendant's driver saw or should have seen it, and that his conduct in entering the fog without slowing down was a proximate cause of the accident.

The District Judge charged the jury on plaintiffs' basic theory of negligence in part as follows:

"It is the contention of the plaintiffs, James Norman Wilmoth and Marquetta Ann Jackson, that Gletus Wilmoth and Jerry Ray Jackson were passengers in the Ford automobile being driven by John W. Hendricks at approximately 12:55 A.M. on December 4, 1965, and that their respective deaths were instantly caused when the tractor-trailer of the defendant, Shell Oil Company, being driven by its servant, William E. Powell, struck the automobile from the rear on Interstate 240, between the Airways and Lamar interchanges.

"It is the contention of these plaintiffs that William E. Powell, driver of the Shell Oil vehicle, was guilty of proximate negligence in his failure to use reasonable and ordinary care in the manner in which he drove his vehicle in the circumstances existing at the time of the collision.

"These plaintiffs contend that their vehicle passed the gasoline truck on Interstate 240 in the center lane and proceeded eastwardly ahead of the gasoline truck; that William E. Powell was negligent in the manner in which he drove his vehicle, considering atmospheric conditions, visibility, speed and other factors then existing.

\* \* \* \* \* \*

"Negligence generally means the failure to use reasonable and ordinary care under the circumstances. It may be an act of omission or an act of commission. It may be the failure to do something which should have

been done under the circumstances, or the doing of something which should not have been done under the circumstances. What might be an act of negligence under one set of circumstances might not be an act of negligence under other circumstances. So when you come to consider which of the passengers and drivers were negligent, and whether any, all or none of them were, you will bear in mind the definition I have given you: Negligence generally means the failure to use reasonable and ordinary care.

\* \* \* \* \* \*

"You should consider all circumstances which from the proof you find to have existed at the time of the collision, and as those facts were known, or should have been known, in the exercise of reasonable and ordinary care to the parties involved. You should consider the unusual circumstances of fog and smog on Interstate 240 on December 4, 1965, including its density, its noticeability in the vicinity of the collision, the visibility of the drivers of the vehicles, the conduct of the drivers and passengers in view of all of the circumstances which they knew or should have known existed at and prior to the time of the collision. You should consider the speed of the vehicles, the possibility of avoiding injury to others using the highway, and the prudence required in the exercise of reasonable and ordinary care with regard to stopping or continuing to move in the circumstances.

\* \* \* \* \* \*

"With reference to how one should drive, manage, control or operate a vehicle under the common law, that is, the law exclusive of any State statute, one must drive or manage the automobile or vehicle he is driving with reference to speed, control and position he is occupying on the highway or street in the exercise of reasonable and ordinary care. The law requires that he must keep a proper lookout and requires that he must keep the vehicle under proper control and position in the street, and that he exercise reasonable and ordinary care in order that he may not run the vehicle he is driving into someone else lawfully using the highway or street, and so manage his vehicle that he will not cause damage to the person or property of another."

He also charged specifically on a state statute prohibiting following too closely, T.C.A. § 59–824, and instructed the jury that the negligence of the driver of the passenger car (if any) could not be imputed to plaintiff's decedents.

The only real dispute of fact in this case appears to be whether Shell's driver knew or should have known of the fog before he entered it. A newspaper reporter for the Memphis Commercial Appeal testified as follows:

"Q. In the course of your investigation, did you talk to Mr. Powell?

"A. Yes, sir.

"Q. On how many occasions did you talk to Mr. Powell?

"A. One time.

"Q. Did you ask him questions about how the accident happened?

"A. Yes, sir.

"Q. I will ask you if he made—pursuant to your questions, if he made this response:

" 'When I came over the Airway overpass eastbound it was clear.'

"Did he make that statement to you?

"A. Yes, sir.

"Q. Did he also make the following statement:

" 'Down below ahead I could not see any lights, just a sea of fog.'

"A. Yes, sir."

This was, however, the only testimony in this entire record which tended to establish that defendant's driver had actual knowledge of the fog. He himself flatly denied the "sea of fog" statement quoted above and denied that he had any warning at all until he was actually in it.

Defendant's driver's testimony on this score has support in this record from at least three witnesses who were not themselves involved in the accidents.

State Police Trooper Rinehart had been called to the scene of this accident by the 35 or more crashes which had occurred between 10:15 p. m. and midnight. He estimated that 12 to 15 wreckers and six ambulances had been on the scene and police squad cars with flashers had been stationed so as to warn traffic approaching the fog area. He testified that everything cleared at about midnight—the warning cars were withdrawn and the wreckers had just finished pulling cars off. He was in his police car in the median strip. He testified:

"Q. Just tell us, officer—I won't lead you—tell us what happened there right before this Shell Oil Company accident.

"A. Well, one thing, there were three wrecker drivers in my car. I think probably the best way to explain this—there were three wrecker drivers in my car and when this smog came in, as it was moving in, one of them stated 'Well, here it is again.' And it wasn't —didn't seem like over ten or fifteen seconds or maybe not that long, until we heard this bang and clatter of metal and tires, like had a load on them, or scuffing or skidding, at which time they bailed out of my car, and I went to turn around, and went back up to the direction from which we heard this impact."

One of the wrecker drivers in addition to supporting Rinehart's comments about the suddenness of the onset of fog just before this accident, also testified about conditions prior to midnight:

"Q. Tell the jury whether or not before driving into this valley you could tell there was fog in there.

"A. Well, you couldn't tell it until you was right into it that you hit it. Of course, I knew I was going to be into it so I was expecting it.

"Q. Could you see it actually with your eyes until it hit the windshield?

"A. No, couldn't hardly tell you were in it before it hit you there."

A commercial photographer who was called to the scene after the Shell Oil tanker collision also described the sudden entrance into fog:

"Q. Go ahead, Mr. Cadwell, and tell the jury and the Court what you saw, what was your first notice in regard to any fog, or smog, or smoke, or otherwise.

"A. As I proceeded down the hill, which is a slight downgrade, really I was only driving thirty-five or forty miles an hour at the time because they had told me to proceed with caution and I didn't know exactly how far the accident scene was, I didn't see anything until all of a sudden I was already into the fog or smog. And so I stopped and pulled over, and proceeded possibly a few feet until I could find a parking spot on the side of the road."

The most decisive evidence, however, was probably that of Hendricks, the driver of the passenger car in which plaintiffs' decedents were riding. He testified:

"Q. All right, tell the Court and jury when you reached that point and encountered that light fog, what did you do?

"A. Well, when I hit the light fog, I let off of my accelerator pedal, and I went a good ways—well, ten or twelve car lengths in this, and it cleared up. It didn't completely clear up, got real light again, real light. Then I went down maybe four or five car lengths in light fog. Then I hit this, just like a blanket—somebody threw a dark blanket over the windshield there, and immediately got on the brakes.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Could you see out beyond the windshield?

"A. That is about as far as I could see, the windshield.

"Q. Just the windshield?

"A. The windshield. Say, for instance, you are going down the street

and wind blow a newspaper up over the windshield, the wind pick up something, blow it up over the windshield, you know, just couldn't see anything."

We have recited this testimony at some length because it appears to us that these are the crucial facts against which most of the legal issues must be resolved. Indeed, what we have already pointed out serves to convince us that appellants' argument that the jury verdict was against the preponderance of the evidence must fail. There was evidence from which the jury could have concluded that defendant's driver neither knew nor could have known of the existence of fog before it blinded his view.

Similarly, we feel that what has been said requires our denying reversal for new trial on the ground that the District Judge failed to outline plaintiffs' theory to the jury and merely gave a "bare bone" charge. We feel that what we have quoted of the record and the charge serves to indicate that the District Judge fairly presented plaintiffs' principal contentions and the law applicable thereto.

Appellants also complain that the District Judge did not grant all of their requests to charge on a variety of statutes and ordinances. Under the facts of this case we find no error in respect to the District Judge's denial of any of these charges. We note specifically that if Tennessee had maintained its assured clear distance rule in its original form, as set forth in West Coast Construction Co. v. White, 130 Tenn. 520, 172 S.W. 301 (1914), that a charge on this topic might well have been required. But the rule was substantially modified as long ago as 1933 in Main Street Transfer & Storage Co. v. Smith, 166 Tenn. 482, 63 S.W.2d 665 (1933). Much more recently the Supreme Court of Tennessee said:

"It has been considered by the profession generally that Main St. Transfer and Storage Company v. Smith modified the assured clear distance rule to the extent that it is no longer

true that it is negligence as a matter of law to drive an automobile at such a speed as to be unable to stop within the distance which is measured by the driver's range of vision. Any other interpretation of Main St. Transfer and Storage Co. v. Smith seems illogical and unconvincing when thought of in connection with the right of a motorist to assume that others on the highway will be obeying the traffic laws. This is only another way of saying that the assured clear distance rule does not apply as a matter of law where the motorist encounters a dangerous situation which in the exercise of reasonable care he had no reason to expect." Halfacre v. Hart, 192 Tenn. 342, 346, 241 S.W.2d 421, 423 (1951).

See also Virginia Avenue Coal Co. v. Bailey, 185 Tenn. 242, 205 S.W.2d 11 (1947).

We cannot say that the omission of the assured clear distance rule as it now stands in Tennessee law was reversible error in this case.

Similarly, we find no reversible error in the District Judge's refusal to admit a driver training manual published by defendant which contained a stopping distance chart for various speeds in relation to equipment such as was involved here. Although we think the general standards of this chart were admissible for comparison to the actual facts of this case, we cannot consider its exclusion to have been prejudicial. Undisputed testimony shows that the integrity of the entire air brake system on the tractor-trailer unit was substantially affected by rupture by the collision of an air line leading to the left front brake. Such a major alteration of the assumptions upon which the chart was based would make its testimonial value very slight under the facts of this case.

Plaintiffs were not entitled to have admitted in evidence a compromise settlement which defendant had made with other parties involved in this same accident. Lewis v. Dixie-Portland Flour Mills, Inc., 356 F.2d 54 (6th Cir. 1966).

Nor do we find any error in the District Judge's order of consolidation of cases such as these involving claims of death, injury and property damage arising out of one accident. Fed.R.Civ.P. 42(a). This is particularly true in the absence of objection to such consolidation or of any motion for severance.

In our view plaintiffs were not entitled to a directed verdict, and review of the Judge's charge taken as a whole discloses no reversible error.

All in all, we conclude that plaintiffs had a fair jury trial and that the facts developed might well convince a succession of juries to the same result.

Affirmed.